Filed 2/19/26; certified for partial publication 3/17/26 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JAZMIN AYALA-VENTURA,<br><br>Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF FRESNO COUNTY,<br><br>Respondent;<br><br>CCS FACILITY SERVICES – FRESNO INC. et al.,<br><br>Real Parties in Interest. | F089695<br><br>(Super. Ct. No. 24CECG03802)<br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Fresno County. Lisa M. Gamoian, Judge.

Wilshire Law Firm, John G. Yslas, Jeffrey C. Bils, and Edward Kim for Petitioner.

No appearance for Respondent.

Martenson, Hasbrouck & Simon LLP, Robin E. Largent, and Alex A. Smith for Real Parties in Interest.

-ooOoo-

Jazmin Ayala-Ventura filed a putative class action complaint against her former employer, CCS Facility Services-Fresno Inc. (CCS), alleging various state law violations for unpaid wages, meal and rest break violations, failure to reimburse business expenses, and unlawful business practices. CCS moved to compel arbitration of Ayala-Ventura's claims pursuant to an arbitration agreement she executed when she was hired. The trial court granted CCS's motion, ordered arbitration of Ayala-Ventura's individual claims, and dismissed the class claims.

On appeal, Ayala-Ventura contends: (1) the arbitration agreement is unconscionable because it is overbroad, lacks mutuality, and indefinite in duration; and (2) the trial court is bound by stare decisis to follow *Cook v. University of Southern California* (2024) 102 Cal.App.5th 312 (*Cook*), and erred by finding *Cook* factually distinguishable, not persuasive, and not binding.

Given the uncertainty of the trial court order's appealability, we deem the appeal a petition for writ of mandate. We deny the petition on the merits.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Arbitration Agreement

CCS, formerly PBC SolutionOne, Inc., provides commercial janitorial services in multiple states including California for various types of properties. CCS hired Ayala-Ventura as a janitor in Fresno, California in June 2021 and her employment continued until March 2022. As part of the onboarding process, Ayala-Ventura was emailed links to an online system to sign several of CCS's policies including a five-page "Mutual Agreement to Arbitrate" (Agreement). To agree to each policy, an employee must click on the link "review policy," and may view the policy in English or Spanish. The system asks the employee, " 'Do you agree to the terms of this policy?' " and the employee may respond by clicking "yes" or "no." The system prevents the employee from answering "yes" unless the corresponding document being agreed to has been manually scrolled through. Ayala-Ventura electronically signed CCS's onboarding

2.

documents including the Agreement on June 8, 2021, and a CCS representative signed the Agreement on the same date.

The Agreement has a section titled "Voluntary Mutual Agreement to Arbitrate Claims" that states in relevant part: "PBC SolutionOne, Inc. dba CCS Facility Services and all of its related entities, parents, and subsidiaries (hereinafter 'Company') and I voluntarily agree to the resolution by arbitration of all claims, disputes, and/or controversies (collectively 'claims'), whether or not arising out of Employee's employment or the termination of employment, that Company may have against Employee or that Employee may have against Company or against its employees or agents in their capacity as employees or agents. The claims covered by this Arbitration Agreement include, but are not limited to, claims for wages or other compensation due; claims for breach of any contract or covenant (express or implied); tort claims; claims for discrimination or harassment, including, but not limited to, alleged violation of any federal or state civil rights laws, ordinances, regulations or orders, based on charges of discrimination or harassment on account of race, color, religion, sex, sexual orientation, age, citizenship, national origin, mental or physical disability, medical condition, genetic predisposition, marital status, pregnancy or any other discrimination or harassment prohibited by such laws, ordinances, regulations or orders; claims for benefits (except where an employee benefit or retirement plan specifies that its claims procedures shall culminate in an arbitration procedure different from this), and claims for violation of any federal, state, or other governmental law, statute, regulation or ordinance, except claims specifically excluded below." (Bold and underlining omitted.)

Claims not covered by the Agreement include workers' compensation or unemployment claims, "or that Company or Employee may have for injunctive relief."

The Agreement's section titled "Class, Collective, and Representative Action Waiver" states in relevant part: "Employee and Company expressly intend and agree that each will forego pursuing any covered dispute on a class, collective, or representative

3.

basis and will not assert class, collective, or representative action claims against the other in arbitration or otherwise.  Employee and Company shall only submit their own, individual claims in arbitration.  Employee and Company shall be entitled to seek dismissal of any class, collective, or representative claims that the other party attempts to bring and may assert this Agreement as a defense in any proceeding in which class, collective, or representative actions are brought.  [¶]  This waiver does not apply to any representative claims that cannot be waived as a matter of law." (Bold and underlining omitted.)  The Agreement further states:  "Employee understands that by signing this agreement, Company and Employee have both waived their right to a jury trial and their right to assert class or collective action claims with respect to all claims covered by this agreement."  (Capitalization omitted.)

The Agreement specifies any arbitration will be pursuant to the Federal Arbitration Act (9 U.S.C. § 1 et seq.; FAA) and the procedures of the California Arbitration Act (Code Civ. Proc., § 1280 et seq.).[1]  Either the employee or CCS may initiate the arbitration process by mailing the other party a demand for arbitration.  The Agreement details the process for selecting an arbitrator, starting with an attempt by the parties to mutually agree on a neutral arbitrator.  CCS will bear the costs of arbitration except the costs of any legal representation.  The arbitrator would however have the authority to order the payment of a party's legal fees as part of any remedy ordered and to the extent permissible under the law.

A section titled "Voluntary Agreement" of the Agreement states:  "Employee acknowledge [*sic*] that Employee has carefully read this Arbitration Agreement, that Employee understands its terms, that all understandings and agreements between Company and Employee relating to the subjects covered in the Agreement are contained in it, and that Employee has entered into the Agreement voluntarily and not in reliance on

---

[1]     Undesignated statutory references are to the Code of Civil Procedure.

any promises or representations by Company other than those contained in this Agreement." (Bold and underlining omitted.) The Agreement further states: "Employee further acknowledges that Employee has been given the opportunity to discuss this agreement with Employee's private legal counsel and has availed himself or herself of that opportunity to the extent employee wishes to do so." (Capitalization omitted.) The Agreement includes a severability clause.

The Agreement "shall survive the termination of Employee's employment," and may only be revoked or modified by a writing signed by the employee and a human resources representative from CCS.

## B. The Complaint

In August 2024, Ayala-Ventura filed a class action lawsuit against CCS alleging various wage and hour violations under state law. The complaint alleged Ayala-Ventura was employed by CCS as an hourly paid, nonexempt employee. The operative first amended complaint against CCS and its affiliate entities alleges eight causes of action for violations of various Labor Code provisions for failure to: (1) pay minimum and straight time wages (Lab. Code, §§ 204, 1194, 1194.2, 1197, 1197.1); (2) pay overtime wages (Lab. Code, §§ 1194, 1198); (3) provide meal periods (Lab. Code, §§ 226.7, 512); (4) authorize and permit rest periods (Lab. Code, § 226.7); (5) timely pay final wages at termination (Lab. Code, §§ 201–203); (6) provide accurate itemized wage statements (Lab. Code, § 226); (7) reimburse employees for expenses (Lab. Code, § 2802); and (8) produce requested employment records (Lab. Code, §§ 226, 1198.5). The ninth cause of action alleges a violation of California's Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.). Ayala-Ventura brought all nine causes of action individually and on behalf of all other hourly paid or nonexempt employees during the statute of limitations periods applicable to the pleaded claims. The complaint sought unpaid overtime, meal and rest period compensation, penalties, plus injunctive and other equitable relief.

## C. Motion to Compel Arbitration

On December 12, 2024, CCS filed a motion to compel individual arbitration and dismiss class claims. CCS argued the Agreement requires individual arbitration of all Ayala-Ventura's wage and hour claims because they fall within the scope of the Agreement. The motion further argued Ayala-Ventura waived the ability to pursue claims on a class basis and once her individual claims are compelled to arbitration, all class claims should be dismissed in their entirety and the case otherwise stayed pending completion of arbitration. Attached to CCS's motion was a declaration by Janet Kiefer, CCS's corporate controller, detailing the onboarding process for new employees to review and sign CCS's policies including the Agreement.

Ayala-Ventura filed an opposition to CCS's motion. In her opposition, Ayala-Ventura did not dispute she signed the Agreement or the Agreement's authenticity. Nonetheless, she argued the Agreement was unenforceable as a matter of law because it was procedurally and substantively unconscionable. The Agreement was alleged to be procedurally unconscionable as a contract in adhesion. Ayala-Ventura claimed the Agreement was substantively unconscionable because it was overly broad in scope, lacked mutuality, and indefinite in duration. Ayala-Ventura argued the Agreement was the type of "infinite agreement" found unenforceable in *Cook*. She further argued the Agreement was replete with other unconscionable terms that taint the Agreement's central purpose with illegality such that it cannot be enforced pursuant to *Ramirez v. Charter Communications, Inc.* (2024) 16 Cal.5th 478 (*Ramirez*). Specifically, she claimed the Agreement: (1) requires Ayala-Ventura to arbitrate claims brought in conjunction with sexual harassment or assault claims in violation of applicable law (the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 or EFAA); and (2) mandates dismissal rather than a stay of Ayala-Ventura's court action upon order to arbitration, which is contrary to the FAA. Ayala-Ventura asserted that as an infinite agreement, the Agreement's unconscionability cannot be cured by severance and

6.

urged the trial court not to enforce the Agreement.

CCS filed a reply to Ayala-Ventura's opposition contesting her arguments the Agreement was procedurally and substantively unconscionable. CCS argued the Agreement differed from the agreement at issue in *Cook* and *Cook* must be considered in its context. CCS disagreed the Agreement was so permeated with unconscionability it was unenforceable and argued in the alternative that the court could sever any offending provisions and enforce the remaining provisions based on the Agreement's express severability clause.

## D. The Trial Court's Ruling

On March 27, 2025, the trial court issued a tentative ruling to compel arbitration of Ayala-Ventura's individual claims, dismiss the class claims, and stay the proceedings pending arbitration of her individual claims. The court found any procedural unconscionability was minimal because the Agreement is assertedly " '[v]oluntary,' " and indicating assent to the Agreement required scrolling through the document whereas selecting " '[n]o' " did not. The court concluded the analysis turns on consideration of the substantive unconscionability prong. Regarding Ayala-Ventura's reliance on *Cook*, the court stated *Cook* was "a decision from the Second District Court of Appeals. The Fifth District Court of Appeals has not yet cited to *Cook* as authority on the issues of scope, duration, and lack of mutuality as presented in *Cook*." The court concluded it "was not obligated to find *Cook* persuasive, nor does it." The court found the instant case distinguishable from *Cook*. The court agreed with CCS the Agreement should be read in context as only applying to employment-related claims. The court rejected Ayala-Ventura's argument the Agreement violated the EFAA given the Agreement was entered into before the EFAA became effective on March 3, 2022. The court further observed Ayala-Ventura had not included any sexual assault or harassment claims so there were no allegations which would place any claim for sexual assault or harassment occurring after the EFAA was enacted. The court concluded Ayala-Ventura had failed to

meet her burden of showing the Agreement was unconscionable. The tentative ruling specified the minute order adopting it will serve as the order of the court.

On April 3, 2025, the trial court held a hearing regarding the tentative ruling. After hearing both parties' arguments, the court stated it "distinguish[es] the *Cook* matter for the reason as stated." The court further stated "after having reviewed the supporting declaration in the motion to compel arbitration, it does appear that this was not an adhesive contract. It is mutual in nature. It's duration. It's not overly broad, unlike *Cook*. [¶] It had to do with the scope of the employment and resulting termination of that employment. So the [c]ourt finds that it is not unconscionable." The court granted the motion to compel arbitration, dismissed the class claims, and stayed the action for arbitration. The minute order reflects the court adopted the tentative ruling as its ruling and would serve as the court's order.

Ayala-Ventura filed a timely appeal.

DISCUSSION

## I. Appealability

"A reviewing court has jurisdiction over a direct appeal only when there is (1) an appealable order or (2) an appealable judgment." (*Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 696; § 904.) An order compelling arbitration is generally not appealable. (*Reyes v. Macy's, Inc.* (2011) 202 Cal.App.4th 1119, 1122 ["an order granting a motion to compel arbitration is not an appealable order"]; *Abramson v. Juniper Networks, Inc.* (2004) 115 Cal.App.4th 638, 648 (*Abramson*) ["no immediate, direct appeal lies from an order compelling arbitration"]; see § 1294 [identifying appealable orders in the context of arbitration].) "Such orders are normally subject to review only on appeal from the final judgment." (*Nelsen v. Legacy Partners Residential, Inc.* (2012) 207 Cal.App.4th 1115, 1121–1122; §§ 906, 1294.2; see § 904.1, subd. (a) [an appeal may be taken from a final judgment but not an interlocutory judgment].)

8.

CCS does not address, let alone contest, the appealability of the trial court's order. An appellate court cannot obtain jurisdiction over a nonappealable order by agreement of the parties. (*Kurwa v. Kislinger* (2013) 57 Cal.4th 1097, 1105.) We are obliged to consider the order's appealability because it goes to our jurisdiction. (*Olson v. Cory* (1983) 35 Cal.3d 390, 398; *Jennings v. Marralle* (1994) 8 Cal.4th 121, 126–127.)

Relying on *Franco v. Athens Disposal Co., Inc.* (2009) 171 Cal.App.4th 1277, 1288, Ayala-Ventura argues the trial court's order is appealable under the "death knell" doctrine because the court dismissed the class claims. "The death knell doctrine is applied to orders in class actions that effectively terminate class claims, such as orders denying class certification or decertifying a class, while allowing individual claims to persist. [Citations.] The doctrine is animated by the concern 'that an individual plaintiff may lack incentive to pursue his individual claims to judgment, thereby foreclosing any possible appellate review of class issues.' [Citation.] To preserve appellate review of class issues, the death knell doctrine permits appeal from 'an order that … amounts to a de facto final judgment for absent plaintiffs, under circumstances where … the persistence of viable but perhaps de minimis individual plaintiff claims creates a risk no *formal* final judgment will ever be entered.' [Citation.] Under this doctrine, an order compelling a plaintiff to pursue his or her claim in arbitration and dismissing the action as to all other members of the class has been held to be immediately appealable." (*Phillips v. Sprint PCS* (2012) 209 Cal.App.4th 758, 766.)

*Nixon v. AmeriHome Mortgage Co., LLC* (2021) 67 Cal.App.5th 934 (*Nixon*) involved similar circumstances to this case. The plaintiff in *Nixon* likewise had an arbitration agreement with her former employer and brought a putative class action lawsuit against that employer for various Labor Code violations and unfair business practices. (*Id*. at pp. 940–941.) The trial court granted the employer's motion to compel arbitration of Nixon's individual claims, dismissed the class claims, and stayed proceedings in the trial court pending the outcome of the arbitration. (*Id*. at p. 942.) The

9.

Court of Appeal acknowledged that while an order compelling arbitration is not generally immediately appealable (*id*. at p. 943), "[a] superior court's order denying class certification or dismissing class claims is appealable pursuant to the death knell doctrine" (*id*. at p. 942). The court however found it "far from certain whether the judicially created death knell exception to the one final judgment rule for an order dismissing class claims extends to make appealable an otherwise nonappealable order compelling arbitration when the two orders are issued simultaneously. [Citation.] Because the order compelling arbitration in this context shares certain characteristics of an interlocutory or interim order appealable under … section 906—that is, it ' "involves the merits or necessarily affects the judgment or order appealed from or … substantially affects the rights of a party" ' [citations]—the order compelling arbitration of Nixon's individual claims is arguably appealable as part of Nixon's appeal of the dismissal of her class claims. [Citation.] However, by its terms … section 906 authorizes review of an interim nonappealable order '[u]pon an appeal pursuant to [s]ection 904.1 or 904.2'—that is, an appeal from a final judgment, postjudgment orders and certain specific, defined interlocutory orders. Section 906, therefore, provides, at best, an imperfect basis for jurisdiction in an appeal pursuant to the judicially created death knell doctrine." (*Nixon*, at pp. 943–944, fns. omitted.) The court found arbitration had already been significantly delayed and the issues fully briefed, and "[r]eview of the arbitration order, integral to a proper evaluation of the order dismissing class claims, will not cause any additional delay or subvert the purpose of the arbitration statute." (*Id*. at p. 944.) Based on the uncertainty of Nixon's right to appeal, among other reasons, the court exercised its discretion to treat the appeal as a petition for writ of mandate and considered the order compelling arbitration on the merits. (*Ibid*.)

Here, the trial court's order poses the same uncertainty in its appealability as the order in *Nixon* because it also compelled arbitration of Ayala-Ventura's individual claims while dismissing the class claims and staying the proceedings in the trial court pending

10.

the outcome of arbitration. While the order dismissing class claims is arguably appealable as a de facto final judgment against absent plaintiffs, the order compelling arbitration of the individual claims is not immediately appealable. But dismissal of the class claims is necessarily dependent on the enforceability of the Agreement. Under the circumstances, we will exercise our discretion to deem Ayala-Ventura's appeal of the order compelling arbitration a petition for writ of mandate and consider the order on the merits. We do not reach this decision lightly as we agree with the *Nixon* court: "Reviewing an order compelling arbitration by writ should be done sparingly and only in an appropriate circumstance to avoid defeating the purpose of the arbitration statute." (*Nixon*, *supra*, 67 Cal.App.5th at p. 944.) But, as in *Nixon*, arbitration in this case has already been significantly delayed, the issues are fully briefed, and review of the order will not cause additional delay or subvert the purpose of the arbitration statute. The essential facts are also undisputed. We therefore proceed to address the order on the merits. (See *Nelsen v. Legacy Partners Residential, Inc.*, *supra*, 207 Cal.App.4th at pp. 1120–1123 [treating appeal from order compelling arbitration as writ petition]; *Phillips v. Sprint PCS*, *supra*, 209 Cal.App.4th at pp. 767–768 [same]; *Szetela v. Discover Bank* (2002) 97 Cal.App.4th 1094, 1098 [same].)

## II. Enforceability of the Agreement

"California law, like federal law, favors enforcement of valid arbitration agreements." (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 97 (*Armendariz*); see § 1281.2 [court "shall" order arbitration upon finding an agreement to arbitrate a controversy exists absent certain circumstances].) "But the strong policy in favor of enforcing arbitration agreements does not arise until an enforceable agreement is established." (*Baker v. Osborne Development Corp.* (2008) 159 Cal.App.4th 884, 892; *Abramson*, *supra*, 115 Cal.App.4th at p. 649 ["[t]he validity of the order compelling arbitration necessarily turns on the enforceability of the underlying agreement to arbitrate"].)

11.

"A written agreement to submit a controversy to arbitration is valid, enforceable, and irrevocable, 'save upon such grounds as exist for the revocation of any contract.' [Citation.] Unconscionability provides such grounds." (*Ramirez*, *supra*, 16 Cal.5th at p. 492, quoting § 1281; see § 1670.5 [court may refuse to enforce an unconscionable contract].)

"The general principles of unconscionability are well established. A contract is unconscionable if one of the parties lacked a meaningful choice in deciding whether to agree and the contract contains terms that are unreasonably favorable to the other party." (*OTO L.L.C. v. Kho* (2019) 8 Cal.5th 111, 125 (*OTO*).) Unconscionability has both procedural and substantive elements. (*Ramirez*, *supra*, 16 Cal.5th at p. 492.) "Substantive unconscionability focuses on the actual terms of the agreement, while procedural unconscionability focuses on the manner in which the contract was negotiated and the circumstances of the parties." (*American Software, Inc. v. Ali* (1996) 46 Cal.App.4th 1386, 1390.) Both procedural and substantive unconscionability must be present for a contract to be unenforceable, although they need not be present to the same degree. (*Armendariz*, *supra*, 24 Cal.4th at p. 114.) Courts apply a sliding scale under which "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Ibid*.) Substantive unconscionability is determined only after procedural unconscionability has been established. (*Ramirez*, at p. 494.)

We determine the unconscionability of a contract at the time it was made. (*Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 920.) "The ultimate issue in every case is whether the terms of the contract are sufficiently unfair, in view of all relevant circumstances, that a court should withhold enforcement." (*Id*. at p. 912.) "The party resisting enforcement of an arbitration agreement has the burden to establish unconscionability." (*Ramirez*, *supra*, 16 Cal.5th at p. 492.)

The parties agree the material facts are not disputed, and our review of the Agreement's enforceability is de novo. "Interpreting a written document to determine whether it is an enforceable arbitration agreement is a question of law subject to de novo review when the parties do not offer conflicting extrinsic evidence regarding the document's meaning." (*Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 60.)

### A.    *Procedural Unconscionability*

"A procedural unconscionability analysis 'begins with an inquiry into whether the contract is one of adhesion.' [Citation.] An adhesive contract is standardized, generally on a preprinted form, and offered by the party with superior bargaining power 'on a take-it-or-leave-it basis.' " (*OTO*, *supra*, 8 Cal.5th at p. 126.) Where a contract is adhesive, "[t]he pertinent question, then, is whether circumstances of the contract's formation created such oppression or surprise that closer scrutiny of its overall fairness is required. [Citations.] ' " '*Oppression* occurs where a contract involves lack of negotiation and meaningful choice, *surprise* where the allegedly unconscionable provision is hidden within a prolix printed form.' " ' " (*Ibid*.) " 'The circumstances relevant to establishing oppression include, but are not limited to (1) the amount of time the party is given to consider the proposed contract; (2) the amount and type of pressure exerted on the party to sign the proposed contract; (3) the length of the proposed contract and the length and complexity of the challenged provision; (4) the education and experience of the party; and (5) whether the party's review of the proposed contract was aided by an attorney.' " (*Id*. at pp. 126–127.) Lying, manipulating, or otherwise placing the party under duress to enter a contract indicate procedural unconscionability. (*Baltazar v. Forever 21, Inc.* (2016) 62 Cal.4th 1237, 1245 (*Baltazar*).)

Ayala-Ventura does not challenge on appeal the trial court's finding the procedural unconscionability of the Agreement was minimal. We address the court's finding on the issue primarily to resolve an ambiguity in the record regarding its ruling.

13.

In its tentative ruling, the trial court recognized the Agreement was "somewhat adhesive in appearance, as the terms of the agreement were pre-printed." But the court noted the Agreement asserted it was " '[v]oluntary,' " and assenting to it required scrolling through the entire document whereas declining the Agreement did not. The court concluded in its tentative ruling that any procedural unconscionability was minimal. In contrast, at the hearing, the court stated the Agreement was not an adhesive contract based on the declaration attached to CCS's motion. The court subsequently adopted the tentative ruling as its order without modification.

CCS claims Ayala-Ventura "arguably waived"[2] and conceded the issue of procedural unconscionability on appeal because she did not address the issue in her opening brief, nor did she address the trial court's apparent finding of no procedural unconscionability at the hearing. CCS contends it is unnecessary to address substantive unconscionability because both elements must be present for an agreement to be unenforceable, and absent procedural unconscionability, the order compelling arbitration must be affirmed. In the alternative, CCS avers it remains undisputed any procedural unconscionability was minimal at best and there must be a high degree of substantive unconscionability to avoid enforcement of the Agreement. In response, Ayala-Ventura argues the court's oral pronouncement at the hearing regarding procedural unconscionability was not its final, formal ruling because the court subsequently adopted its tentative ruling without modification after the hearing. She contends the court's finding of a minimal degree of procedural unconscionability is not at issue on appeal and should not be disturbed.

A trial court is not bound by statements made prior to entering its ruling on a

[2]     "[T]he correct legal term for the loss of a right based on failure to timely assert it is 'forfeiture,' because a person who fails to preserve a claim forfeits that claim. In contrast, a waiver is the ' "intentional relinquishment or abandonment of a known right." ' " (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2.)

motion, nor can the court's statements be used to impeach the ruling. (*In re Marriage of Ditto* (1988) 206 Cal.App.3d 643, 646–647.) A court may enter an order or judgment wholly different from that announced. (*Id*. at p. 646.) "A trial court's oral ruling on a motion does not become effective until it is filed in writing with the clerk or entered in the minutes. [Citations.] Accordingly, the trial court may properly file a written order differing from its oral rulings when the rulings have not been entered in the minutes of the court. [Citation.] Furthermore, when the trial court's minute order expressly indicates that a written order will be filed, only the written order is the effective order." (*In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1170.) So long as the court's oral ruling has not been entered into the minutes, the court may issue a written ruling that conflicts entirely with its oral ruling.

The record does not contain any minute order reflecting the trial court's comments at oral argument were entered as its final ruling. On the contrary, the minute order issued after the hearing simply adopted the tentative ruling without modification as the order of the court. As CCS acknowledges, the court's statement at the hearing created a lack of clarity on the issue of procedural unconscionability. But the court's comments at oral argument do not constitute the final decision or ruling of the court. They are not the order under review. The formal order entered by the court concluded any procedural unconscionability of the Agreement was minimal.

In any event, we agree with the trial court's conclusion the procedural unconscionability of the Agreement was minimal. The Agreement was on a preprinted form and presented to Ayala-Ventura with only the options of accepting or declining it. While an employee's assent to the Agreement was characterized as voluntary, a reasonable inference may be made that declining the Agreement could result in withdrawal of the job offer. But there is little to suggest any element of surprise given the Agreement was a stand-alone arbitration agreement and identified as such, not an arbitration clause buried in a contract. We have no information about Ayala-Ventura's

15.

education and experience, but the Agreement was not in small typeface and its provisions were broken up into legible paragraphs with titles identifying each section. The Agreement could be viewed in either English or Spanish. There is no evidence CCS lied, manipulated, or placed Ayala-Ventura under duress to sign the Agreement. No facts show she was subjected to time pressure to sign, and the Agreement specified the employee could discuss it with legal counsel, indicating time could be taken to consider its terms. The Agreement bears hallmarks of an adhesive contract, but the circumstances do not otherwise reflect oppression in its formation. (Cf. *OTO*, *supra*, 8 Cal.5th at pp. 127–128 [employee was presented with a one-page arbitration agreement with block text in small font while a porter waited for him to sign].)

Contracts of adhesion nonetheless " 'contain a degree of procedural unconscionability even without any notable surprises, and "bear within them the clear danger of oppression and overreaching." ' " (*Baltazar*, *supra*, 62 Cal.4th at p. 1244.) "[C]ourts must be 'particularly attuned' to this danger in the employment setting, where 'economic pressure exerted by employers on all but the most sought-after employees may be particularly acute.' " (*Ibid*.) "[A] finding of procedural unconscionability does not mean that a contract will not be enforced, but rather that courts will scrutinize the substantive terms of the contract to ensure they are not manifestly unfair or one-sided." (*Gentry v. Superior Court* (2007) 42 Cal.4th 443, 469, abrogation on other grounds recognized in *OTO*, *supra*, 8 Cal.5th at p. 129, fn. 10.)

### B. *Substantive Unconscionability*

"Substantive unconscionability examines the fairness of a contract's terms. This analysis 'ensures that contracts, particularly contracts of adhesion, do not impose terms that have been variously described as " ' "overly harsh" ' " [citation], " 'unduly oppressive' " [citation], " 'so one-sided as to "shock the conscience" ' " [citation], or "unfairly one-sided" [citation]. All of these formulations point to the central idea that the unconscionability doctrine is concerned not with "a simple old-fashioned bad bargain"

[citation], but with terms that are "unreasonably favorable to the more powerful party." ' " (*OTO, supra,* 8 Cal.5th at pp. 129–130.)  This " 'component of unconscionability looks to whether the contract allocates the risks of the bargain in an objectively unreasonable or unexpected manner.' " (*Magno v. College Network, Inc.* (2016) 1 Cal.App.5th 277, 288.)

Ayala-Ventura argues the Agreement's scope is overly broad because it applies to claims unrelated to her employment relationship with CCS and requires binding arbitration of essentially any claim she may have against her employers and all related entities and individuals whether arising out of employment or not.  She contends the relevant operative language of the Agreement is substantively identical to the offending language in the contract at issue in *Cook* and such language is proscribed under *Cook*. Specifically, the Agreement mandates arbitration "of all claims, disputes, and/or controversies (collectively 'claims'), whether or not arising out of [Ayala-Ventura]'s employment or the termination of employment, that Company may have against [Ayala-Ventura] or that [Ayala-Ventura] may have against Company or against its employees or agents in their capacity as employees or agents."  CCS claims this language means if a claim arises out of employment but does not involve termination of employment, it is still covered and vice versa.  CCS argues the Agreement is not overbroad because its intended scope is employment-related claims.

The parties' opposing interpretations reflect the Agreement is somewhat ambiguous in its application to claims that are not employment related.  Ambiguities in an adhesive contract are construed against the drafter.  (*Sandquist v. Lebo Automotive, Inc.* (2016) 1 Cal.5th 233, 247–248; *Victoria v. Superior Court* (1985) 40 Cal.3d 734, 739.)  Civil Code section 1654 codifies this principle by mandating an interpretation against the drafting party who caused the uncertainty but only "[i]n cases of uncertainty *not removed by the preceding rules*."  (Italics added.)  Civil Code section 1643 precedes Civil Code section 1654 and requires interpretation of a contract that "will make it

lawful, operative, … and capable of being carried into effect, if it can be done without violating the intention of the parties." Our Supreme Court has specifically applied Civil Code section 1643 in construing arbitration agreements. "Where a contract is susceptible to two interpretations, one which renders it valid and the other which renders it void, a court should select the interpretation that makes the contract valid." (*Ramirez*, *supra*, 16 Cal.5th at p. 507; *Pearson Dental Supplies, Inc. v. Superior Court* (2010) 48 Cal.4th 665, 682 ["When an arbitration provision is ambiguous, we will interpret that provision, if reasonable, in a manner that renders it lawful, both because of our public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution, and because of the general principle that we interpret a contractual provision in a manner that renders it enforceable rather than void."].) Construing the Agreement in a manner that avoids unconscionability, we interpret the Agreement as applying to only employment-related claims.

Even if we adopted Ayala-Ventura's interpretation of the Agreement, we are not persuaded this language renders it unconscionable based on *Cook*. In *Cook*, the plaintiff (Cook) filed a lawsuit against her former employer, the University of Southern California (USC), and two coworkers alleging discrimination and harassment. (*Cook*, *supra*, 102 Cal.App.5th at pp. 316–317.) Cook and USC had an arbitration agreement wherein they " 'agree[d] to the resolution by arbitration of all claims, whether or not arising out of Employee's University employment, remuneration or termination, that Employee may have against the University or any of its related entities, including but not limited to faculty practice plans, or its or their officers, trustees, administrators, employees or agents, in their capacity as such or otherwise; and all claims that the University may have against Employee.' " (*Id*. at p. 317.) The trial court deemed the agreement unconscionably infinite in scope and duration because it "applied to 'all' of Cook's claims regardless of whether they arose from her employment," for the rest of her life from any injury related to USC or its related entities. (*Id*. at p. 318.) The Court of Appeal likewise

18.

found unconscionable the agreement's requirement the plaintiff must resolve by arbitration "any and all claims, whether or not they arose from the employee/employer relationship." (*Id*. at p. 324.) The agreement was further deemed unconscionable because it survived indefinitely following Cook's termination from USC and lacked mutuality as it did not require USC's " 'related entities' " to arbitrate their claims against Cook. (*Id*. at pp. 325–326.)

*Cook* must be considered in its own context which differs materially from the circumstances in this case. (*Sanchez v. Valencia Holding Co.*, *supra*, 61 Cal.4th at p. 911 ["An evaluation of unconscionability is highly dependent on context."].) As in *Cook*, the Agreement potentially covers a broad array of claims regardless of whether they arise out of Ayala-Ventura's employment with CCS. But the *Cook* court did not conclude an arbitration agreement covering all claims including those unrelated to employment is per se unconscionable as Ayala-Ventura seems to argue. Because "parties are free to contract for asymmetrical remedies and arbitration clauses of varying scope," the Agreement's purportedly broad scope does not necessarily mandate a finding of unconscionability. (*Armendariz*, *supra*, 24 Cal.4th at p. 118.) The agreement in *Cook* was unconscionable in part because of the multifarious ways in which a claim against USC "completely unrelated to [Cook's] employment" could arise. (*Cook*, *supra*, 102 Cal.App.5th at p. 318.) As an example, the trial court observed that if Cook were to undergo a botched surgery at USC's hospital in 15 years, her claims would still be subject to arbitration. (*Ibid*.) Given CCS solely provides commercial janitorial services, we are hard-pressed to discern how a similarly vast range of claims completely unrelated to Ayala-Ventura's employment could arise, nor does Ayala-Ventura offer a similar panoply of potential claims she might assert. The Agreement's scope is not unconscionably broad under the circumstances in this case.

This more limited potential claims bears on Ayala-Ventura's claim the Agreement is unconscionable because it is infinite in duration. The Agreement states it "shall

survive the termination of [Ayala-Ventura's] employment. It can only be revoked or modified by a writing signed by [Ayala-Ventura] and the Human Resources Representative of the Company that specifically states an intent to revoke or modify this Arbitration Agreement." Ayala-Ventura argues this language is substantially the same as the language the *Cook* court found unconscionable because the agreement survived indefinitely following the plaintiff employee's termination. Specifically, the agreement in *Cook* provided it " 'shall survive the termination of Employee's employment, and may only be revoked or modified in a written document that expressly refers to the "Agreement to Arbitrate Claims" and is signed by the President of the University.' " (*Cook*, *supra*, 102 Cal.App.5th at p. 317.) Though the Agreement's language is substantially like that in *Cook*, we reiterate the importance of context in determining unconscionability. The various potential claims that could arise against USC together with the agreement's infinite duration made it unconscionable. Ayala-Ventura claims if she were injured in an automobile accident caused by one of CCS's company vehicles 10 years after her employment, she would be compelled to arbitrate a claim. But without facts about the number of company vehicles generally in use by CCS, we are unable to assess the probability of this occurrence, which appears speculative at best. Nothing in the record indicates CCS's operations have anything like the well-known, broad capacity of USC's reach. Cook could be subject to the arbitration agreement forever in any manner of ways including not just a botched surgery but an injury while attending a USC football game in 15 years.

Having concluded the Agreement is not unconscionably broad in scope or duration, we turn finally to Ayala-Ventura's contention the Agreement lacks mutuality. "In assessing substantive unconscionability, the paramount consideration is mutuality." (*Abramson*, *supra*, 115 Cal.App.4th at p. 664.) "Agreements to arbitrate must contain at least ' "a modicum of bilaterality" ' to avoid unconscionability. [Citation.] When only the weaker party's claims are subject to arbitration, and there is no reasonable

justification for that lack of symmetry, the agreement lacks the requisite degree of mutuality." (*Id*. at p. 657.) As stated by our Supreme Court, "an arbitration agreement imposed in an adhesive context lacks basic fairness and mutuality if it requires one contracting party, but not the other, to arbitrate all claims arising out of the same transaction or occurrence or series of transactions or occurrences." (*Armendariz*, *supra*, 24 Cal.4th at p. 120.)

Ayala-Ventura points out the Agreement defines " 'Company' " as: " 'PBC SolutionOne, Inc. dba CCS Facility Services and all of its related entities, parents, and subsidiaries.' " She contends this definition lacks inclusion of the " 'employees or agents in their capacity as employees or agents' " referenced in the same section, and when read together with the Company definition, requires Ayala-Ventura to arbitrate her claims against CCS and its employees and agents, but does not likewise require CCS's employees and agents to arbitrate their claims against her. Ayala-Ventura relies on *Cook* again to argue the agreements in both cases are similarly unconscionable.

The employee in *Cook* was obliged to arbitrate her claims against USC, its related entities, as well as its "officers, trustees, administrators, employees or agents," but only USC was bound to arbitrate its claims against the plaintiff. The agreement lacked mutuality because USC's " 'related entities' " were not bound to it. (*Cook*, *supra*, 102 Cal.App.5th at p. 319.) Here, the Agreement's definition of "Company" expressly includes CCS's related entities and binds those entities to arbitration. Cook was also bound to arbitrate any claims against USC's officers, trustees, administrators, employees or agents " 'in their capacity as such *or otherwise*.' " (*Id*. at p. 317, italics added.) This language was understood as requiring Cook to arbitrate any claims against these individuals even where they were not acting in their identified capacity. In contrast, the Agreement expressly limits arbitration to claims against CCS's employees or agents *in their capacity* as such. Any claims Ayala-Ventura may have against employees or agents unrelated to their role are therefore not subject to the Agreement.

21.

We are not convinced the Agreement's purported failure to require CCS's employees and agents to arbitrate their claims against Ayala-Ventura results in a lack of mutuality between the contracting parties. The Agreement is between CCS and Ayala-Ventura; it is not between her and CCS's employees and agents. A lack of mutuality generally consists of the stronger party imposing terms on the weaker party without accepting those terms itself. (*Armendariz*, *supra*, 24 Cal.4th at pp. 118–120.) But this is not a contract where only the weaker party's claims are subject to arbitration. The Agreement "applies equally to employee and employer initiated claims, carrying the 'modicum of bilaterality' required by law." (*Vo v. Technology Credit Union* (2025) 108 Cal.App.5th 632, 644.) It gives an illustrative list of possible arbitrable claims but makes clear the list is not exhaustive because potential claims "are not limited to" those listed. (*Id*. at pp. 644–645; *Baltazar*, *supra*, 62 Cal.4th at p. 1249 [illustrative list was not meant to be exhaustive and casts no doubt on the agreement's comprehensive reach to apply to all claims between the employee and employer].) Excluded claims include workers' compensation and unemployment claims, which "are excluded from arbitration by law." (*Ramirez*, *supra*, 16 Cal.5th at p. 498.) The Agreement otherwise only precludes claims both parties may have for injunctive relief. (Cf. *Abramson*, *supra*, 115 Cal.App.4th at pp. 664–665 [trade secret carve-out in an arbitration agreement unconscionably permitted only the employer to seek injunctive relief].)

The other terms in the Agreement contain no indicia of substantive unconscionability. The parties must attempt to mutually agree on a neutral arbitrator. If they cannot agree, an arbitrator is chosen pursuant to the process in section 1281.6.[3] The

---

[3]     Section 1281.6 provides for appointment of an arbitrator in pertinent part:  "In the absence of an agreed method [of appointing an arbitrator], or if the agreed method fails or for any reason cannot be followed, or when an arbitrator appointed fails to act and his or her successor has not been appointed, the court, on petition of a party to the arbitration agreement, shall appoint the arbitrator."

arbitrator has the authority to award all remedies and relief that would otherwise have been available if the claim had been brought by a civil complaint. The parties have the "right to a reasonable amount of discovery guided by the Federal Rules of Civil Procedure." The arbitration forum is the county where the employee works or worked for CCS. CCS bears the costs of the arbitrator and other incidental arbitration costs except both parties bear their own costs of legal representation. These terms are not unreasonable or oppressively unfair to Ayala-Ventura. (Cf. *Mercuro v. Superior Court* (2002) 96 Cal.App.4th 167, 178–182 [agreement was substantively unconscionable where it did not guarantee a neutral arbitrator and required the employee to pay half the arbitration fees].) The arbitral scheme provides an effective means for her to pursue claims, affords her the same rights and remedies that would be available in court proceedings, and does not impose costs or other barriers that impede Ayala-Ventura from pursuing her statutory rights. (See *OTO*, *supra*, 8 Cal.5th at pp. 133–134 [an agreement to arbitrate wage claims must provide an accessible and affordable forum for wage disputes]; *Armendariz*, *supra*, 24 Cal.4th at p. 106 [arbitration agreement as a condition of employment must provide the employee with adequate discovery to pursue statutory claims].) We conclude the trial court did not err in finding the Agreement is not substantively unconscionable.

## III. Stare Decisis

Ayala-Ventura contends the trial court's open refusal to adhere to *Cook* violates the well-established principle the decisions of all Courts of Appeal are binding on all superior courts as stated in *Auto Equity Sales v. Superior Court* (1967) 57 Cal.2d 450, 455. She claims the court committed reversible error by refusing to follow *Cook* even though mandated to do so by stare decisis.

Because our review is de novo, we review the trial court's ruling, not its rationale. We therefore need not address Ayala-Ventura's specific assertions of error in the court's reasoning. (*Earnest v. Commission on Teacher Credentialing* (2023) 90 Cal.App.5th 62,

23.

74.)  We nonetheless address her contentions regarding stare decisis to provide guidance to the parties and the trial court.

The trial court concluded it was "not obligated to find *Cook* persuasive, nor does it" because this court had not yet cited *Cook* as authority on the issues of scope, duration, and lack of mutuality.  To the extent the court believed it was not bound by *Cook* until it is cited by this court, this is incorrect.  As our Supreme Court said in *Auto Equity Sales v. Superior Court*, *supra*, 57 Cal.2d 450, the "[d]ecisions of every division of the District Courts of Appeal are binding upon all the justice and municipal courts and upon all the superior courts of this state, and this is so whether or not the superior court is acting as a trial or appellate court.  Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction." (*Id*. at p. 455.)  Pursuant to this holding, "[a]ll trial courts are bound by all published decisions of the Court of Appeal [citation], the only qualifications being that the relevant point in the appellate decision must not have been disapproved by the California Supreme Court and must not be in conflict with another appellate decision." (*Sarti v. Salt Creek Ltd.* (2008) 167 Cal.App.4th 1187, 1193.)  This "means that a trial judge sitting in San Francisco is equally bound by decisions from divisions of the Court of Appeal sitting in Fresno, San Diego and even Orange County just as much as he or she is bound by decisions by a panel sitting in San Francisco." (*Id*. at p. 1193, fn. 2.)  "The doctrine of stare decisis requires a trial court to follow an unambiguous published holding of the Court of Appeal, even if the trial court believes that the appellate opinion was erroneously decided." (*Cuccia v. Superior Court* (2007) 153 Cal.App.4th 347, 349 (*Cuccia*).)  Accordingly, while the trial court here was free to find *Cook's* reasoning unpersuasive, it was unquestionably bound by *Cook* as a published opinion by a court of superior jurisdiction.

"But nothing about stare decisis prevents courts from fairly distinguishing cases." (*People ex rel. Green v. Grewal* (2015) 61 Cal.4th 544, 565.)  When a trial court is confronted with a published opinion it believes to be erroneous that compels it to rule

24.

one way, the court "has no choice but to follow the declared law in the appellate opinion '*wherever the facts of the case are not fairly distinguishable from the facts of the case in which [the appellate court has] declared the applicable principle of law.*' " (*Cuccia*, *supra*, 153 Cal.App.4th at p. 354, italics added.)[4] A trial court may thus distinguish the facts and circumstances of the case before it from those in a binding authority.

Ayala-Ventura claims the trial court justified its refusal to follow *Cook* based on a meaningless distinction between the facts of *Cook* and the circumstances here. She points to the ruling's discussion that the defendant employer in *Cook* had taken conflicting stances as USC initially argued the agreement encompassed all claims whether employment related or not but then argued on appeal the agreement only covered employment-related claims. Here, and in contrast, Ayala-Ventura avers CCS consistently argued the Agreement applies to claims arising out of the employment relationship. Ayala-Ventura argues the court failed to explain why this trivial factual distinction was legally significant and did not otherwise distinguish *Cook*.

While the trial court should explain why it found *Cook* distinguishable from the instant case in declining to follow it, the grounds on which the court did so are somewhat unclear. We agree with Ayala-Ventura though that the conflicting stances of the defendant employer in *Cook* is not a material distinction from the facts in this case. Unlike the trial court, we are not bound by *Cook*. We have taken no issue, however, with the *Cook* court's reasoning on the issues of substantive unconscionability. Instead, we have found the circumstances in *Cook* distinguishable in factually and legally significant ways as discussed above. The trial court was free to do the same.

---

[4] Additionally, "the trial court should make a record articulating why it believes the binding opinion is erroneous and should be revisited by the appellate court which is free to either disagree with or overrule the opinion." (*Cuccia*, *supra*, 153 Cal.App.4th at p. 354.)

**DISPOSITION**

The appeal is deemed a petition for writ of mandate. The petition is denied. CCS is entitled to recover its costs on appeal.

PEÑA, J.

WE CONCUR:


LEVY, Acting P. J.


FRANSON, J.

**<u>CERTIFIED FOR PARTIAL PUBLICATION</u>**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JAZMIN AYALA-VENTURA,<br><br>Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF FRESNO COUNTY,<br><br>Respondent;<br><br>CCS FACILITY SERVICES – FRESNO INC. et al.,<br><br>Real Parties in Interest. | F089695<br><br>(Super. Ct. No. 24CECG03802)<br><br><br>**ORDER GRANTING PARTIAL PUBLICATION** |

On March 10, 2026, this court received and filed a request for publication of the nonpublished opinion filed on February 19, 2026, in the above entitled matter. It appearing that part of the nonpublished opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), it is ordered that the opinion be certified for publication in the Official Reports with the exception of parts I. and III. of the Discussion.

PEÑA, J.

WE CONCUR:

LEVY, Acting P. J.

FRANSON, J.

1.